**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN MARTINEZ, | ) | |
| | ) | No. 1:23-cv-01741 |
| *Plaintiff*, | ) | |
| | ) | Hon. Thomas M. Durkin, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, GERI LYNN | ) | |
| YANOW, as special administrator of the | ) | |
| ESTATE OF ERNEST HALVORSEN, | ) | |
| HECTOR VERGARA, GERI LYNN | ) | |
| YANOW, as special administrator of the | ) | |
| ESTATE OF JOSEPH MOHAN, RANDY | ) | |
| TROCHE, KEVIN ROGERS, as special | ) | |
| administrator of the ESTATE OF FRANCIS | ) | |
| CAPPITELLI, EDWARD MINGEY, the | ) | |
| CITY OF CHICAGO, JAKE RUBINSTEIN, | ) | |
| and COOK COUNTY, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendants*. | ) | |

**COMPLAINT**

NOW COMES Plaintiff, JOHN MARTINEZ, by his attorneys LOEVY & LOEVY, and

complaining of Defendants REYNALDO GUEVARA, GERI LYNN YANOW, as special

administrator of the ESTATE OF ERNEST HALVORSEN, HECTOR VERGARA, GERI

LYNN YANOW, as special administrator of the ESTATE OF JOSEPH MOHAN, RANDY

TROCHE, KEVIN ROGERS, as special administrator of the ESTATE OF FRANCIS

CAPPITELLI, EDWARD MINGEY, the CITY OF CHICAGO, JAKE RUBINSTEIN, and

COOK COUNTY, states as follows:

**INTRODUCTION**

1.     Plaintiff John Martinez was wrongly convicted of the 1998 first-degree murder of

Daniel Garcia. He spent decades in prison for a crime that he did not commit.

2.      Plaintiff's arrest, prosecution, and conviction were based on identifications by eyewitness that were wholly manufactured by notorious Chicago Police Detective Reynaldo Guevara and the other Defendants named in this Complaint.

3.      Based on those identifications, the testimony of Defendants, and a false statement obtained from Plaintiff after an abusive, days-long interrogation, Plaintiff was wrongly convicted of the first-degree murder of Daniel Garcia. He was sentenced to 25 years in prison.

4.      Plaintiff is one of at least 39 men and women exonerated after being convicted on murder charges arising in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

5.      Reviewing the misconduct in Plaintiff's case, the Illinois Appellate Court called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

6.      Cook County courts have found that Defendant Guevara "engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

7.      In court proceedings, Defendants Guevara, his partner Halvorsen, and their associates have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct as police officers, and Defendant Guevara has specifically pleaded his Fifth Amendment right not to incriminate himself on multiple occasions in response to questions about his misconduct during as a police officer, including during the investigation that caused Plaintiff's wrongful conviction.

2

**8.**    On August 9, 2022, having concluded that convictions obtained by Defendant Guevara cannot stand consistent with due process, Illinois state prosecutors moved to vacate the convictions of eight victims of Defendant Guevara in an unprecedented mass exoneration of murder convictions.

**9.**    On January 17, 2023, Plaintiff's conviction was vacated and a new trial was granted. On February 9, 2023, the State dropped all charges against Plaintiff. On February 9, 2023, the State dropped all charges against Plaintiff, and he was released from prison. 22 years after Plaintiff's terrible ordeal began, Plaintiff was finally free.

**10.**    Plaintiff was a son, a brother, a domestic partner, and an expectant father to be when he was targeted and torn from his family, framed for a crime he did not commit by Defendants.

**11.**    Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the incalculable loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

**12.**    This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

**13.**    This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

**14.**    Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

15.     Plaintiff JOHN MARTINEZ spent 22 years in prison for a crime he did not commit.

16.     At all times relevant to the events described in this complaint, Defendants Reynaldo Guevara, Ernest Halvorsen, Hector Vergara, Joseph Mohan, Randy Troche, Francis Cappitelli, Edward Mingey, and other unknown law enforcement officers were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago. These Defendants are referred to collectively as the "Police Officer Defendants" throughout this Complaint.

17.     Geri Lynn Yanow, the Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

18.     Geri Lynn Yanow, the Special Representative for Joseph Mohan, deceased, is named as a Defendant in her capacity as Special Representative of Joseph Mohan, as successor in interest and to defend this action on behalf of Defendant Joseph Mohan.

19.     At all times relevant to the events described in this complaint, Defendants Francis Cappitelli and Edward Mingey, and other unknown law enforcement officers supervised the Police Officer Defendants. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

20.     Kevin Rogers, the Special Representative for Francis Cappitelli, deceased, is named as a Defendant in his capacity as Special Representative of Francis Cappitelli, as successor in interest and to defend this action on behalf of Defendant Francis Cappitelli.

21.     At all relevant times, Defendant Jake Rubinstein was an Assistant Cook County State's Attorney. He conspired with the Police Officer Defendants, prior to the existence of probable cause to believe Plaintiff had committed a crime, and while acting in investigatory capacities. This Defendant is referred to as the "Prosecutor Defendant" throughout this Complaint.

22.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Police Officer Defendants. Each of the individual Defendants named in this complaint acted at all relevant times as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Police Officer Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

23.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office and was at all relevant times the employer of the Prosecutor Defendant. Defendant Cook County is a necessary party to this lawsuit.

24.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crime

25.     On October 11, 1998, Manuel Rodriguez drove Daniel Garcia to an alley in the area of Armitage and Whipple to buy narcotics. Garcia went into the alley and came out running with a bag of cocaine.

5

26.     In the early morning hours of the following day, Jesus Fuentes drove Daniel
Garcia to the same alleyway. Esteban Rodriguez was also in the car. The men had been drinking
near Garcia's house and had gone out to buy more beer. Fuentes' son was also in the car.
Fuentes, his son, and Rodriguez remained in the car when Garcia got out at the alley.

27.     After about 15 minutes of waiting, Garcia had not returned. Fuentes drove around
looking for Garcia. He pulled into the alley and saw a group of five or six men. Garcia was on
the ground, severely beaten.

28.     Two months later, on December 10, 1998, Garcia died from his injuries.

**Defendants Fabricate Witness Identifications of
Plaintiff from Esteban Rodriguez and Jesus Fuentes**

29.     After Garcia's death, Defendants were assigned by Defendant Mingey as the lead
investigators in the case.

30.     In interviews with police before and after Garcia's death, Esteban Rodriguez and
Jesus Fuentes said that they had not observed the beating and had not been able to get a look at
any of the individuals in the group of men in the alley who might have been responsible for the
beating.

31.     Despite making clear that they were not witnesses and could not identify anyone,
Defendants worked to obtain identifications from Esteban Rodriguez and Jesus Fuentes.

32.     On February 8, 1999, Defendants conducted a lineup procedure with Esteban
Rodriguez. According to their reports, Esteban identified three individuals—Plaintiff, Jose
Tinajero, and Thomas Kelly—as perpetrators.

33.     The identification procedure was suggestive. Esteban Rodriguez told police he did
not see anyone in the alley on the night Garcia was attacked. It was only after repeated

6

interactions with Defendant Guevara that Esteban Rodriguez allegedly changed his story and told Defendant Guevara that he had seen some men in the alley that night.

34. However, even after his initial interactions with Defendant Guevara, Esteban Rodriguez continued to make clear that he could not identify anyone he had observed briefly on the street, and he never said that he had observed a beating.

35. Nonetheless, after Defendant Guevara personally picked Esteban Rodriguez up and brought him to the police station and then accompanied him to view the lineup, Rodriguez changed his story and identified Plaintiff and the other men.

36. Two weeks later, on February 23, 1999, Defendants conducted a different lineup procedure with Jesus Fuentes. According to Defendants, Fuentes identified the same three individuals that Esteban Rodriguez had in the previous lineup.

37. This second identification procedure was also suggestive.

38. Like Esteban Rodriguez, Jesus Fuentes had never indicated that he witnessed a beating, nor did he ever indicate that he saw anyone at all on the night Garcia was beaten.

39. Because it was implausible that two supposed eyewitnesses who had never seen the crime could identify the perpetrators, Defendants fabricated police reports and interviews to make the witnesses seem credible. In these false reports, Defendants suggested that witnesses had given them information about the potential perpetrators that suggested they might be able to make an identification. The reports were fabricated.

**Defendants Fabricate Witness Identifications of Plaintiff from Margarita Casiano**

40. Defendants also fabricated identifications from other witnesses.

41. On February 6, 1999, Margarita Casiano materialized as a witness in the case.

42.     Despite not being mentioned before, Defendant Guevara claimed that weeks earlier, closer in time to the crime, she had told him that she was an eyewitness.

43.     Casiano was a self-described daily drug user. She allegedly informed Detective Guevara that, in October of 1998, she went to the alley at Armitage and Whipple for drug-related purposes when she saw four white male Latin Kings, who she knew as Toy, Johnny, Rabbit, and Snoopy, laughing about how they beat someone up and left him in the alley. At some point, she allegedly identified a picture of Toy as Jose Tinajero.

44.     Four weeks later, the police re-interviewed Casiano and she identified Johnny as John Martinez, Rabbit as Angel Serrano, and Snoopy as Thomas Kelly.

45.     Defendants fabricated Casiano's statement by feeding facts to Casiano and telling Casiano what to say.

**Defendants Fabricate Witness Identifications of Plaintiff from Melloney Parker**

46.     Defendants also fabricated witness testimony from Melloney Parker implicating Plaintiff in the crime.

47.     On the night of the crime, Melloney Parker was sleeping in her apartment on Whipple near Armitage when she awoke and looked out the window to see a Latino man walking through the alley. The man approached six or seven other men in the alley, and a brawl ensued. After the brawl, the group left, leaving victim on the ground.

48.     Parker placed an anonymous call to 911. Once the ambulance arrived, she went back to sleep and did not talk to anyone about the incident for several months.

49.     As with other witnesses, Defendants wrote reports long post-dating events in their investigation. These reports fabricated events that never occurred to make Parker a witness in the case.

50.     In those reports, Defendants claimed that on an unspecified date, Defendants traced the 911 call and found Parker.

51.     According to Defendants, Parker told them that she had recognized one of the men in the group as a local gang member who drove a grey car. She did not identify the man by name.

52.     Defendants also claimed that they showed Parker a photo array, and that Parker identified the initiator of the brawl as Jose Tinajero.

53.     This information was false. Parker never identified any person from the photo array conducted by Defendants.

54.     On February 8, 1999, four months after the crime, Defendants conducted a lineup with Parker. According to Defendants, Parker identified Plaintiff and Tinajero as two of the individuals who participated in the beating.

55.     Two hours later, Parker signed a handwritten statement provided to her by Defendant Rubinstein. The statement described Parker seeing Plaintiff and Tinajero in the alley, as part of the group beating up on the victim. The statement said that Plaintiff was punching the victim, and that Tinajero returned to the victim to prod him with his foot.

56.     The identifications and statement were fabricated by Defendants. Parker did not see the faces of any of the men in the group. She could not tell Plaintiff and Tinajero apart, even in the police identification procedures. In court, she identified different people as the offenders

than she had before trial. When presented with a picture of Plaintiff at trial, she said she never had seen his face.

57.     Parker only identified Plaintiff because Defendants told her that he had committed the crime. She was fed facts of the crime by Defendants. She only signed the statement written by Defendants and provided to her because she had been held at the police station for a long period of time and wanted to leave.

58.     In addition, at the time of her identifications, there was a pending warrant for Parker's arrest, and Defendants used that warrant to pressure her into adopting their false statements, telling her that they would have the warrant quashed if she went along with them.

### Defendants Arrest Plaintiff and Coerce A False Statement From Him

59.     On February 7, 1999, Tinajero was arrested and denied having any knowledge of the offense.

60.     According to police reports, Tinajero initially told police that he had information about a beating of a different man that occurred only a few days before he was arrested. Defendant Troche told Tinajero that they instead wanted information about an October 1998 beating.  Tinajero denied any knowledge of any October beating. Tinajero was handcuffed and kept in a locked interview room for hours before Defendant Guevara showed up to interrogate him.

61.     After Defendant Guevara was called in, however, Tinajero changed his story and admitted his involvement, naming Plaintiff, Kelly, and Serrano as the individuals who beat Garcia.

62.     Tinajero provided this statement because Defendant Guevara coerced him and told him what to say. Defendants suppressed that the statement they obtained from Tinajero was fabricated.

63.     That night, police arrested Plaintiff, Kelly, and Serrano. No one made any admissions, even when confronted with the information that they had been identified as the assailants.

64.     Plaintiff was placed in an "extended investigative hold" for over 34 hours.

65.     During these 34 hours, Defendants Guevara and Troche took turns aggressively questioning Plaintiff and yelling at him. Plaintiff told Defendants repeatedly what he had seen, and denied that he ever gave the victim a hard kick.

66.     Plaintiff was kept in a windowless room for two nights, only provided only a very small amount of food to eat.

67.     Defendants did not give Plaintiff anything to drink.

68.     Plaintiff was also kept from sleeping, as people kept coming in and out of the room for the entirety of the investigative hold.

69.     Eventually, Defendant Troche explained to Plaintiff that if he signed some papers he could go home. Troche told Plaintiff that they were just going to use him as a witness.

70.     In fear of further abuse from Defendants, Plaintiff agreed to provide whatever statement Defendants provided.

71.     Defendant Rubinstein was present while Plaintiff's interrogation was ongoing and participated personally in fabricating the false incriminating statement that Plaintiff was forced to sign.

72.     After more than 34 hours in an "extended investigative hold," Defendant Rubinstein questioned Plaintiff in the early morning hours of February 9th, without writing anything down.

73.     Defendant Rubinstein wrote a statement outside of Plaintiff's presence and presented it to Plaintiff.

74.     Plaintiff did not read English well, did not read the statement, and believing he was just a witness, signed the statement because Defendants had forced him to.

75.     The statement said that Plaintiff heard commotion, went to the alley, and saw Tinajero, Serrano, and Kelly standing around the victim. According to the statement, Plaintiff gave the victim two kicks to the side, used his foot to roll Garcia onto his back, and then left.

76.     Over 48 hours after Kelly was arrested, he signed a handwritten statement in the presence of Guevara, indicating that he saw Tinajero beat Garcia. He did not implicate Plaintiff nor Serrano.

77.     Plaintiff and Tinajero were charged with Garcia's murder.

78.     Plaintiff's statement, coerced and manufactured by Defendants, was used to prosecute and convict Plaintiff of a crime he did not commit.

**Plaintiff's Wrongful Conviction and Imprisonment**

79.     As a result of Defendants' misconduct, Plaintiff was tried in the Circuit Court of Cook County.

80.     Plaintiff's criminal trial began in August of 2001.

81.     The State's case hinged on the testimony of Melloney Parker.

82.     Plaintiff testified in his own defense, explaining that he had nothing to do with the crime, and explaining that he was coerced into signing Defendants' statement.

83.     There was no physical evidence of any kind linking Plaintiff to the crime.

84.     The Court found Plaintiff guilty of murder.

85.     Without the dubious and manipulated eyewitness testimony of Melloney Parker, Plaintiff would never have been convicted.

12

86.     Plaintiff was only 18 years old at the time of his arrest. The following decades of his life were consumed by the horror of his wrongful imprisonment.

87.     Because of the Defendants' misconduct, Plaintiff's opportunity to know his family and make a life with them was taken away.

88.     Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

89.     Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

90.     Plaintiff spent over 20 years in prison before being released.

91.     In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

92.     Plaintiff was branded a murderer. He has suffered profound reputational harm as a result.

**Plaintiff's Exoneration**

93.     Plaintiff fought hard to prove his innocence throughout his wrongful incarceration.

94.     On January 17, 2023, Plaintiff's conviction was vacated. On February 9, 2023, the prosecution dismissed the case, and Martinez was released from prison.

95.     At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half his life.

### Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution

96.     The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

97.     Since the 1980s, no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

98.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses in order to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

99.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

100.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never

disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

101.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

102.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

103.    The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

104.    In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

105.    The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

106.    In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract

15

involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

107.     Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

108.     Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

109.     For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Defendant Guevara and Miedzianowski worked together in gang crimes before Defendant Guevara became homicide detective. Defendant Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzanowski to pin murders on innocent men.

110.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for

16

maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

111.    The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

112.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

113.    As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which

17

the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

114.    This belief extends to the Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

115.    The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.    The conduct of live lineup, photographic, and other identification procedures.

b.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.    The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.    The risks of engaging in tunnel vision during investigation.

f.     The need for full disclosure, candor, and openness on the part of all officers who

participate in the police disciplinary process, both as witnesses and as accused

officers, and the need to report misconduct committed by fellow officers.

116.     The need for police officers to be trained in these areas was and remains obvious.

The City's failure to train Chicago police officers as alleged in the preceding paragraph caused

Plaintiff's wrongful conviction and his injuries.

117.     The city's failure to train, supervise, and discipline its officers, including the

Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the

Defendants committed against Plaintiff in this case. Constitutional violations such as those that

occurred in this case are encouraged and facilitated as a result of the City's practices and de facto

policies, as alleged above.

118.     The City of Chicago and final policymaking officials within the Chicago Police

Department failed to act to remedy the patterns of abuse described in the preceding paragraphs,

despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful

practices and ensured that no action would be taken (independent of the judicial process) to

remedy Plaintiff's ongoing injuries.

119.     The policies and practices described in the foregoing paragraphs were also

approved by the City of Chicago policymakers, who were deliberately indifferent to the

violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

120.     As a result of the policies and practices of the Chicago Police Department,

described above, Defendant Guevara has framed dozens of other innocent men and women over

the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

121.    As of the filing of this complaint, 39 men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, and John Martinez. These men and women served hundreds of years in prison for crimes they did not commit.

122.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

123.    Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in

such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

124.    Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. The allegations Defendant Guevara has refused to respond to include allegations that he has manipulated dozens of witnesses to provide false identifications, he has fabricated false evidence, he has suppressed exculpatory evidence, including documentary evidence, he has tortured and abused suspects and witnesses and has coerced false statements from them, as well as every single instance of misconduct detailed below.

125.    A few examples of Defendant Guevara's misconduct include:

a.    Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke

21

to the two juveniles outside of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.   Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.   In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d.   In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e.   Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

22

f.    In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g.    Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h.    After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey.

i.    In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j.    In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false

identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

k.   In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

l.   In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, but later came forward to recant and shed light on Defendant Guevara's misconduct.

m.   In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

n.   In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two

24

witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.

o.    In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

p.    In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

q.    In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

r.    In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

25

s.   In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

t.   In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

u.   In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

v.   In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial

26

witnesses. She then conferred with Guevara, even though the Court had ordered
for all witnesses to be excluded from the courtroom to prevent witness collusion.

w.    In 2011, the First District Appellate Court granted Tony Gonzalez a post-
conviction hearing based on evidence that Defendant Guevara conducted an
unduly suggestive lineup. In this instance, Guevara had concocted a photo array in
which Gonzalez's photo was the only one that stood out from the rest.

x.    In 1982, Defendant Guevara and another officer arrested and physically assaulted
Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her
out of the back door of the bus. He twisted her arm, threatened to "snap" it, and
handcuffed her so tightly that her skin broke. He also hit her across the face with a
metal bracelet he was wearing and called her a "nigger bitch."  Turner sought
medical treatment and filed a complaint with the Chicago Police Department's
Office of Professional Standards (OPS).

y.    In 1982, Defendant Guevara and three other officers broke through Almarie
Lloyd's locked front door and conducted a warrantless search of her home. When
Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd,
her brother, and her two children, and left the home in shambles. Lloyd filed a
complaint with OPS the next day.

z.    In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt
from his home and handcuffed him to a ring in the wall at the police station where
he was beaten about the head, face, and body until he confessed to murder and
robbery charges. Hunt was detained for approximately 23 hours and deprived of
food, water, and sleep until after he confessed. Hunt sought medical treatment for

his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claims that the Area Five police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

aa.     In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

bb.     In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

cc.     In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd.    In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

ee.    In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff.    In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

gg.    In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would

be sent away for fifty years. Guevara then promised Rivera that if signed a statement, he could go home.

hh.  In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, nothing that "not only was the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

ii.  In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

jj.  In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor

30

could write the statement in English. Frias-Munoz then signed a statement that he could not read.

kk.   In 1993, Defendant Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder. Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of the crime for which Guevara had arrested him. Vicente has since testified that his statements were false and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

ll.   In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm.  In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

31

nn.     In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo.     In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

pp.     In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

qq.     In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara *never* took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

rr.     In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes in order to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

ss.    In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

tt.    In 1999, Defendant Guevara and his colleagues repeatedly punched David Gecht in the stomach and back and struck him during an interrogation. After this prolonged abuse, Gecht told Guevara and the other officers he would do "whatever they wanted," and adopted a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

uu.    In addition, Guevara threatened Gecht's girlfriend, Colleen Miller, telling her that she would be arrested and that the child she was expecting would be born in prison and then taken from her if she did not cooperate with them. Guevara used Miller's fear for herself and her unborn child to extract a fabricated statement from her implicating Gecht in the shooting.

vv.    In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

126.    Defendant Guevara never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

127.    In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

**COUNT I**
**42 U.S.C. § 1983 – Due Process**
**(Fourteenth Amendment)**

128.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

129.    As described in detail above, the Police Officer Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

130.    In the manner described more fully above, the Police Officer Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

131.    The Police Officer Defendants knew this evidence was false.

132.    The Police Officer Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

133.    In addition, the Police Officer Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

**134.** In addition, based upon information and belief, the Police Officer Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

**135.** The Police Officer Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

**136.** The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**137.** As a result of the Police Officer Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

**138.** The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT II**
**42 U.S.C. § 1983 – Coerced and False Confession**
**(Fifth and Fourteenth Amendments)**

**139.** Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**140.** In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendant, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used

35

against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

141.     In addition, the Police Officer Defendants and the Prosecutor Defendant, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

142.     In addition, the Police Officer Defendants and the Prosecutor Defendant, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

143.     Specifically, these Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will, resulting in him making involuntary statements implicating himself in the murder of Daniel Garcia.

144.     Those false incriminating statements were wholly fabricated by these Defendants and attributed to Plaintiff. Those false incriminating statements were used against Plaintiff to his

detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted.

145.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

146.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

147.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.


**COUNT III**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

148.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

149.    In the manner described above, the Police Officer Defendants and the Prosecutor Defendant, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

150.    In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to

judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

151.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

152.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

153.    The misconduct described in this Count by these Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.


**COUNT IV**
**42 U.S.C. § 1983 – Failure to Intervene**

154.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

155.    In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants or the Prosecutor Defendant stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

156.    These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

157.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

158.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

159.     The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT V
## 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

160.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

161.     In the manner described more fully above, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence, suppress evidence, and coerce statements, to detain, prosecute, and convict Plaintiff, without regard for Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

162.     In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

163.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

164.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

165.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

39

166.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT VI
### 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

167.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

168.    As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

169.    At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

170.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

40

171.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

172.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

173.     In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

174.     These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

175.     The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

176.     As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

177.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed

against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

178.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VII**
**State Law Claim – Malicious Prosecution**

179.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

180.     In the manner described above, the Police Officer Defendants and the Prosecutor Defendant, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

181.     In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

182.     The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in January 2023.

43

**183.** The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

**184.** As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
## State Law Claim – Intentional Infliction of Emotional Distress

**185.** Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**186.** The actions, omissions, and conduct of the Police Officer Defendants and the Prosecutor Defendant as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

**187.** As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
## State Law Claim – Willful and Wanton Conduct

**188.** Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**189.** At all times relevant to this complaint the Police Officer Defendants and the Prosecutor Defendant had a duty to refrain from willful and wanton conduct.

**190.** Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

**191.** As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
## State Law Claim – Civil Conspiracy

**192.** Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**193.** As described more fully in the preceding paragraphs, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

**194.** In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

**195.** The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

**196.** The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

197.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT XI**
**State Law Claim – *Respondeat Superior***

198.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

199.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

200.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT XII**
**State Law Claim - Indemnification**

201.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

202.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

203.    The Police Officer Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

204.    Defendant City of Chicago is responsible to pay any judgment entered against the Police Officer Defendants.

205. The Prosecutor Defendant was an employee, member, and agent of Defendant Cook County, acting at all relevant times within the scope of his employment in committing the misconduct described herein.

206. Defendant Cook County is responsible to pay any judgment entered against the Prosecutor Defendant.

WHEREFORE, Plaintiff JOHN MARTINEZ, respectfully requests that this Court enter a judgment in his favor and against Defendants REYNALDO GUEVARA, GERI LYNN YANOW, as special administrator of the ESTATE OF ERNEST HALVORSEN, HECTOR VERGARA, GERI LYNN YANOW, as special administrator of the ESTATE OF JOSEPH MOHAN, RANDY TROCHE, KEVIN ROGERS, as special administrator of the ESTATE OF FRANCIS CAPPITELLI, EDWARD MINGEY, the CITY OF CHICAGO, JAKE RUBENSTEIN, and COOK COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, JOHN MARTINEZ, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**JOHN MARTINEZ**

BY:     s/ Steve Art
        *One of Plaintiff's Attorneys*
        Jon Loevy
        Anand Swaminathan
        Steve Art
        Sean Starr
        Annie Prossnitz
        Loevy & Loevy
        311 N. Aberdeen, 3rd Floor
        Chicago, IL 60607
        steve@loevy.com

47

## CERTIFICATE OF SERVICE

I, Steve Art, hereby certify that on August 3, 2023, I filed the foregoing First Amendment

Complaint using the Court's CM/ECF system, which effected service on all counsel of record.

s/ Steve Art
*One of Plaintiff's Attorneys*
Jon Loevy
Anand Swaminathan
Steve Art
Sean Starr
Annie Prossnitz
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
steve@loevy.com
